CHARLES H. DUDLEY *vs.* R. P. HAZZARD COMPANY.

Kennebec.     Opinion December 14, 1914.

*Assumption of Risk.     Contributory Negligence.     Damages.     Personal Injuries.     Negligence.*

In an action to recover for personal injuries while in the defendant's employ in its shoe factory at Gardiner, the jury having rendered a verdict for the plaintiff in the sum of $6500 and the case being before the Law Court on defendant's motion, it is,

*Held:*

1. That upon the question of the defendant's legal liability, and the plaintiff's right of recovery the record fails to convince the Court that the verdict was manifestly wrong.

2. That upon the question of damages the verdict is so extravagantly large as to warrant its diminution or the granting of a new trial. After critically studying and balancing the testimony on this branch of the case, the conclusion is that the sum of three thousand five hundred dollars would be full and fair compensation for the injuries received.

On motion for new trial by defendant. If the plaintiff, within thirty days after the certificate is filed, remits all of the verdict in excess of $3500 motion overruled; otherwise, motion sustained.

This is an action on the case to recover for personal injuries alleged to have been sustained by plaintiff while in the employ of the defendant, on account of the negligence of the defendant. Plea, the general issue.

The jury returned a verdict for the plaintiff of $6500, and the defendant filed a general motion for a new trial.

The case is stated in the opinion.

*Benedict F. Maher*, for plaintiff.

*McGillicuddy & Morey, and Andrews & Nelson*, for defendant.

SITTING: SAVAGE, C. J., CORNISH, BIRD, HALEY, HANSON, PHILBROOK, JJ.

CORNISH, J. Action on case to recover for personal injuries sustained by the plaintiff on January 13, 1912, while in the defendant's employ in its shoe factory at Gardiner. The jury returned a verdict for the plaintiff in the sum of $6500, and the case is before the Law Court on defendant's motion.

The plaintiff, a man fifty-four years of age, was employed in the basement of defendant's Mill No. 2, and his work consisted in sorting wooden lasts, removing them from a box where they were deposited by a chute from the finishing room on the third floor of Mill No. 1, and placing them in their proper bins in the basement of Mill No. 2. This chute was constructed of a six inch wrought iron pipe, which extended between the two parallel buildings with a drop of six inches per foot for a distance of forty-two feet. The chute entered the basement of Mill No. 2 through the foundation wall and then, by means of a cast-iron elbow was turned parallel with the wall, and continued on down to within a few feet of the floor, where the pipe from the elbow entered a wooden box or bin built to receive the lasts as they were delivered from the chute. Prior to December 23, 1911, the elbow was immovable, with a manhole on top through which the chute could be cleared in case of clogging, and if the cause was beyond the arm's length a jointed rod was used consisting of three or four sections of half inch iron pipe, each about ten feet long and having a thread on one end and a coupling on the other. This method of chute construction had caused so much trouble in the way of clogging, that in an attempt to obviate the difficulty, on December 23, 1911, three weeks before the accident, a detachable

was substituted for the fixed elbow, and the chute was lowered where it entered the basement so as to increase the pitch. After these changes and up to the time of the accident there appears to have been no plugging of the chute and therefore no necessity of using the jointed rod.

On the morning of the accident, according to the plaintiff's testimony, he discovered that the chute had become clogged, and he reported the fact to Mr. Turner, the foreman, who replied, "Let it go to h——." The plaintiff replied "All right," and started off about his work, when Turner said, "I guess I will go upstairs and see about it." Shortly after, the plaintiff heard a rapping on the pipe, and ran and hoisted up the cover of the box and asked what was wanted. Mr. Turner, who was then at the upstairs end of the chute, replied, "Take the elbow off and light a match at the end of the pipe." This the plaintiff proceeded to do. He climbed up on a pile of sacks filled with lasts, began to unhitch the fastenings of the elbow and with the help of another man took it down. He found a jam of a dozen lasts in the elbow, removed them and then lighted a match and held it up to the end of the chute as ordered. He continues: "The chute was right opposite me, and I asked Mr. Turner if it was all right and he said "Yes." And then I stepped back with my right foot off from the lasts, back on to the floor, and then the rod hit me." When standing upon the sacks he says the elbow was breast high and that at the time he was struck, he was stepping down from the sacks, having one foot on them and the other on the floor. The entire rod did not come down but only one section which became unjointed because of worn-out threads.

A thorough study of all the evidence convinces us that the jury had a right to accept the plaintiff's story as true. He is not seriously contradicted, and on the other hand he is corroborated by two eye witnesses of the accident. Nor do we think the verdict upon the question of legal liability is so manifestly wrong as to warrant this Court in disturbing it.

1. *Defendant's Negligence.*

The negligence relied upon by the plaintiff is incidentally the insufficiency in the size of the chute, but principally the furnishing of a defective rod with which to remove any jam that might be formed. It is the latter which he claims to be the sole cause of the accident. The sections were exhibited to the jury and have been produced

before the Law Court. The jury found that the threads had been badly worn, allowing the sections to become easily unjointed and that they were in an unsafe condition for use. This finding was justified by the facts. It was the duty of the defendant to exercise reasonable care in providing reasonably safe machinery and appliances and a reasonably safe place in which its employees could work. It must be conceded that the chute, as first constructed and operated, did not meet this requirement. The smallness of the pipe, only six inches in diameter, combined with its manner of construction permitted frequent cloggings, and to free these, these defective sections were furnished. Only a few weeks before the accident the rod had separated under similar conditions, when being used by the foreman Turner, and had stopped at the manhole, as it must under the former style of construction, and the plaintiff helped take the rod out. He testifies that he subsequently showed it to the Superintendent, Mr. Thompson, and told him the threads were badly worn, and that Thompson acknowledged they were in bad shape and promised to have them repaired. It is true that all this happened before the change, and that the defendant took steps to obviate the difficulty in the chute. But that of itself did not relieve it from the duty resting upon it. It was still bound to use reasonable care in furnishing a reasonably safe chute. It changed the elbow and increased the pitch, but it did not enlarge the pipe nor repair the rods. It is not enough to say that with the changed construction it had no reason to expect that further cloggings would occur. If they should occur the appliances provided for the remedy were the same thread-worn sections, and when the chute did clog on the day of the accident it was these thread-worn sections in the hands of the foreman Turner that caused the injury. Moreover, under the old construction the use of the unsafe rod was attended with less danger than under the new because the immovable elbow would stop its course, if it became detached and escaped, but the movable and removed elbow allowed it a free vent.

Some testimony was introduced in regard to another rod, a "thirty foot rod," which was kept outdoors between the two buildings, and which is claimed to have been in good condition. But that has no bearing upon this case. It was used, if at all, through a manhole cut in the chute outside the building, and not in the manner nor from the place where the defective rods were used. This is not the case

of where a plaintiff has the selection of his tools and himself chooses a defective instead of a sound one, but where the injury is caused by the foreman using the only tool at hand. This rod was in the hands of Turner and not of Dudley. Considering all the testimony we cannot say that the jury were palpably wrong in finding that the defective condition of the rod was the proximate cause of the accident, that the defendant was legally responsible for that condition, and that it had not exercised the degree of care required of an employer under all the circumstances.

2. *Contributory Negligence.*

Whether or not the plaintiff was guilty of contributory negligence depends upon where he was and what he was doing at the time of the accident. The defendant in an elaborate argument, based upon mathematical computations, contends that the plaintiff carelessly placed himself directly in front of the chute and in the path of anything that might be passing through it. The plaintiff admits that he appreciated the possible danger in so doing, and that he supposed he was out of the range, but that the sacks on which he stood were unstable and in stepping from them to the floor he must in some way have gotten in range and so received the injury. The defendant further argues that the plaintiff must have been carelessly looking up the pipe; but this the plaintiff emphatically denies, and the two young ladies who were near by and were witnesses to the accident corroborate his statement.

It is needless to further discuss the evidence on this point which is purely a question of fact. The record fails to convince us that in this respect the verdict was manifestly wrong.

3. *Assumption of Risk.*

This point raised in defense also fails. It is true that the plaintiff had known and appreciated the defective condition of the rod-sections but he testifies that he called the attention of Superintendent Thompson to the fact and the Superintendent promised to have them repaired. This statement the Superintendent denies. It was for the jury to determine which statement was correct, and they accepted the plaintiff's. There is nothing inherently improbable in it, and on the contrary it has the atmosphere of reasonableness and probability. If this was the fact then the plaintiff had a right to continue his work on the strength of that promise, and was relieved from the burden of himself assuming the risk. *Dempsey* v. *Sawyer*, 95 Maine,

298. And it should be added that this jointed rod had been used in connection with the chute before the changes were made and not after, and the plaintiff had a right to assume that by the new construction this use had been rendered unnecessary.

4. *Damages.*

On this point the Court is of opinion that the verdict is so extravagantly large as to warrant its diminution or the granting of a new trial.

The plaintiff was fifty-five years of age. His injuries consisted in the loss of the right eye and a resulting disturbance of the nervous system. The practical consensus of the medical testimony is that there has been a substantial improvement in the nervous condition which may be expected to continue. The plaintiff testified that at the time of the trial he slept "quite well, fairly well," that his appetite had been all right, and his weight was 213 pounds. His suffering must have been severe for a time at least. The accident happened on January 13, 1912. He was under medical treatment until October 31, 1912, when the eye was removed, and since that time he has received more or less medical services. But during the summer of 1912 he worked eighty-four days on the log boom in the Kennebec River, although he claims that his associates performed a great part of his duties. His wages were $2.75 per day, the same as before the accident. In the summer of 1913, he worked again for the same company, and at the same task, eighty-five days at the same rate. His pay at the shoe factory was ten dollars and fifty cents per week. His medical expenses aggregate about three hundred dollars.

After critically studying and balancing the testimony on this branch of the case our conclusion is that the sum of three thousand five hundred dollars would be full and fair compensation for the injuries received,

> *If the plaintiff, within thirty days after the certificate is filed, remits all of the verdict in excess of $3,500 motion overruled, otherwise motion sustained.*